## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **Criminal No.:  05-376 (JDB)** |
| | : | |
| **v.** | : | |
| | : | |
| **YVES JEAN LOUIS,** | : | |
| | : | |
| **and** | : | |
| | : | |
| **ERNSO LOUIS,** | : | |
| **also known as McKinley,** | : | |
| | : | |
| **Defendants.** | : | |

### UNITED STATES MEMORANDUM AND
### PROFFER IN SUPPORT OF PRETRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, hereby respectfully submits this Memorandum and Proffer in Support

of Pre-Trial Detention, and states as follows:

A.  INTRODUCTION

On October 7, 2005, the grand jury returned an indictment charging the defendants with

violation of  18 U.S.C. § 1203, Hostage Taking of a United States citizen, in connection with the

defendants' activities abducting and holding for ransom a nine-year old American girl between

on or about September 26, 2005, and continuing thereafter to on or about October 4, 2005 in the

Republic of Haiti, within the extraterritorial jurisdiction of the United States, and, pursuant to 18

U.S.C. § 3238, within the venue of the United States District Court for the District of Columbia.

The United States seeks to have the defendants held without bond pursuant to the Bail

Reform Act of 1984, codified at 18 U.S.C. §§ 3141-3150.  The United States's Motion is based

on Section 3142(f)(1)(A), and Section 3142(f)(2)(A) because two of the statutory conditions to

hold a persons without bond exist in this case: the defendants committed a crime of violence and the defendants pose a serious risk of flight.  Under 18 U.S.C. § 3156(a)(4), a "crime of violence" is defined as "an offense that has as an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another" or "any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  Clearly, the offense here under 18 U.S.C. § 1203, Hostage Taking, is a crime of violence.  In addition, the defendants have no known ties to the District of Columbia, and nor ties to other states, while they have strong ties to their native land.

Based upon the discussion below, the United States respectfully submits that there is no condition or combination of conditions which "will reasonably assure the appearance of the [defendants] as required and the safety of any other person and the community."  Accordingly, the defendants should be detained without bail pending trial pursuant to 18 U.S.C. § 3142(e)-(f).

As a preliminary matter, and as this Court is well aware, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing."  18 U.S.C. §3142(f).  The United States and the defendant may proceed by way of "proffer or otherwise," id., and hearsay is permitted.  E.g., United States v. Winsor, 785 F.2d 755, 756 (9th Cir. 1986).  Moreover, at a detention hearing, the United States is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use."  United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986).  "The defendant may not use a pretrial detention hearing as a trial on the underlying indictment or as a method for getting discovery from potential witnesses . . . .  Nor

2

may the defendant require the government to divulge its confidential sources in such a proceeding." United States v. Williams, 798 F. Supp. 34, 36 (D.D.C. 1992) (Sporkin, J.).  If there is any examination, federal courts have limited that examination to the disputed issues, since the detention hearing should neither be turned into a mini-trial nor used as a subterfuge to obtain discovery.  See, e.g., United States v. Suppa, 799 F.2d 115, 120 (3rd Cir. 1986).  Finally, without a defense proffer that the United States's information is incorrect, the defendant is not permitted to challenge the government's evidence.  United States v. Winsor, supra, 785 F.2d at 757.

In determining whether to detain the defendant, the Court shall consider the following factors: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence; (2) the weight of the evidence against the defendant; and (3) the defendant's character, physical and mental condition, family ties, employment history, past conduct, and criminal history.  18 U.S.C. § 3142(g).  The burden of proof on the United States on the issue of flight is the "preponderance of the evidence."  United States v. Vortis, 785 F.2d 327, 328-329 (D.C. Cir.), cert. denied, 479 U.S. 841 (1986).  As set forth in Vortis, the law of this Circuit is clear and unambiguous on this point:

> Although appellant argues that the government should be required to establish risk of flight by clear and convincing evidence, we hold that the magistrate correctly applied the preponderance of the evidence standard.  We reach this conclusion for several reasons.  First, although the statute explicitly states that a finding that a person should be detained pretrial as a danger to the community must be supported by 'clear and convincing evidence,' 18 U.S.C. § 3142(f), it is silent on the burden of proof needed for a finding that a person poses a risk of flight.  By contrast, in the context of bail pending appeal, the statute provides for detention unless the court finds, by clear and convincing evidence, that the person is not likely to flee or pose a danger to the community.  18 U.S.C. § 3143(b).  The statutory structure therefore suggests that Congress intended a different burden of

proof for pretrial detention because of risk of flight than for danger to the community. The standard of proof applicable to other kinds of pretrial proceedings is the preponderance of the evidence and we find that to be the appropriate burden for establishing risk of flight. Id.

B.    NO CONDITION OR COMBINATION OF CONDITIONS WILL REASONABLY ASSURE THE APPEARANCE OF ANY OF THESE DEFENDANTS AS REQUIRED.

(1) The Nature and Circumstances of the Offenses Committed

If called to testify about the nature and circumstances of the offenses with which the defendant's are charged, Oscar Montoto and William Clauss, Special Agents of the Federal Bureau of Investigation ("FBI"), would testify to the following facts involved in this case: On or about September 26, 2005, at approximately 2 a.m., the hostage-takers invaded the home of the child located in the Route des Freres section of Port au Prince, Haiti. The child was asleep in the home she occupied with her parents. The child is a nine-year-old girl and is a citizen of the United States, having been born in Boston, Massachusetts in 1995.

The hostage-takers had advance knowledge of the layout of the house from defendant Yves Jean Louis, who by virtue of his past employment by the family of the child, was able to convey detailed information to the three other hostage-takers concerning the physical layout of the house. Defendant Yves Jean Louis, who was also a distant relative of the mother of the child, was angry at the family of the child. Defendant Yves Jean Louis believed that they had underpaid him in his employment and that they had promised him other financial rewards and then declined to provide him with further funds or items of value, thus providing a motive for the hostage-taking.

4

Upon entry on the property, defendant Yves Jean Louis distracted the dogs on the property by giving them food.    While defendant Yves Jean Louis was keeping the dogs occupied, defendant Ernso Louis, and two other hostage-takers entered the home through a previously unlocked entrance.  Having fed the dogs, defendant Yves Jean Louis rejoined the other three in the house.  The group proceeded  to the bedroom of the parents of the child.  Once in the bedroom, defendant Ernso Louis and two other hostage-takers bound the father to prevent him from moving.  One of the other hostage-takers pointed a fake gun at the father of the child. The mother was bound as well.  They stole approximately one thousand US dollars in local currency, a watch and a pair of athletic shoes.  The hostage-takers went to the room where the child was sleeping.  They covered the mouth of the child, picked her up and carried her out of the house, without waking any of the siblings.  The hostage-takers had started to tape the child's mouth shut, but the child explained that she would die if they did that because she could not breathe through her nose.  The child suffers from asthma and a heart condition.  They threatened the child during the abduction that they would kill her if she did not stay quiet.  The hostage-takers also pointed the fake gun at the child's head to threaten her.

Defendant Yves Jean Louis stole the child's father's car and drove it away as the getaway car.  All four of the hostage-takers then took the child to a location and held her there until approximately 10 p.m. that night.  While at that location, although she was blindfolded for much of the time, the child heard clearly the voice of defendant Yves Jean Louis.  The structure at this location was a shack that had little protection from the elements.  For that reason, the hostage-takers decided to move the child to another location.

The hostage-takers proceeded to make ransom demands of the child's family by telephone. The initial demand was $200,000 in U.S. currency. Over the course of the negotiations, which occurred by telephone, the demand amount was eventually lowered to $50,000. The family tried to raise the money but could come up with only an amount of approximately $8,000. The hostage-takers would not accept only that amount.

At least two of the hostage-takers, defendant Ernso Louis and another, next moved the child to a mountainous remote location, accessible only hiking on foot for approximately two hours, in the Ghantier area of Haiti. They held the child hostage in a primitive building there. Defendant Ernso Louis held the child there and cared for her. Another of the hostage-takers returned as needed to that location to put the child on the phone to show proof of life during the ransom negotiations. The hostage-takers repeatedly told the child that if she made too much noise, tried to leave, or told anyone that she had been kidnaped, she and her family would be killed. After a number of days, defendant Ernso Louis decided to permit the child to go outside to play with some other children who lived in the nearby area.

A young adult who resided in the area noticed the arrival of the new child and befriended her. That adult engaged the child in conversation and established a level of trust with her. That adult eventually learned from the child that she had been kidnaped. That adult persuaded the child to write in charcoal on a piece of paper the name of her father and her telephone number.

The adult went to the local authorities with this information. Because of the situation, it was decided that the best approach was for that adult to return to the scene and arrange a way for the child to go outside, which the adult did. The adult entered the house and engaged defendant Ernso Louis in conversation to distract him until an opportunity arose to signal the child to go

6

outside.  When the adult signaled her, the child bolted.  Outside, law enforcement, including the Haitian National Police ("HNP") and the United Nations Civil Police ("UN CivPol"), was waiting.  A short while later, law enforcement entered the building where the child had been held hostage.  They found defendant Ernso Louis inside and detained him.

Agents of the FBI spoke with the child, as well as members of her family.  The child informed them that she knew the identity of one of her kidnappers.  The child related that, although she had been blindfolded for much of the ordeal, she clearly recognized the voice of defendant Yves Jean Louis.  The child was familiar with his voice from having heard it when he worked at her family's home.  The family of the child provided some identifying data and law enforcement was able to determine where defendant Yves Jean Louis was.

Defendant Yves Jean Louis was apprehended by law enforcement at his home.  The FBI interviewed defendant Yves Jean Louis.  At the start of the interview, the FBI informed Defendant Yves Jean Louis of his rights in his native language.  Defendant Yves Jean Louis proceeded to waive his rights orally and in writing.  Defendant Yves Jean Louis gave a statement confessing to his participation in the kidnaping and hostage-taking.  Defendant Yves Jean Louis also implicated his coconspirators defendant Ernso Louis as well as the two other hostage-takers.

The FBI interviewed also defendant Ernso Louis.  At the start of the interview, the FBI informed defendant Ernso Louis of his rights in his native language.  Defendant Ernso Louis proceeded to waive his rights orally and in writing.  Defendant Ernso Louis gave a statement confessing to his participation in the kidnaping and hostage-taking.  Defendant Ernso Louis also implicated his coconspirators, defendant Yves Jean Louis and the two others.

Defendant Ernso Louis was found in possession of the athletic shoes as well as a binder and a wallet belonging to the child's father, all of which had been stolen from the child's house the night of the kidnaping.

Defendant Yves Jean Louis was positively identified by the child after she reviewed a stack of photographs of men.  Upon observing a photograph of defendant Yves Jean Louis, the child identified him by name as a member of the group that kidnaped her and held her hostage.

Defendant Ernso Louis was positively identified by the child after she reviewed a stack of photographs of men.  Upon observing a photograph of defendant Ernso Louis, the child identified him by name as a member of the group that kidnaped her and held her hostage.

(2) <u>The Weight of the Evidence</u>

As discussed above, the evidence in this case will be extraordinarily strong as to the guilt of the defendants on the hostage taking charge.

(3) <u>The History and Characteristics of Defendants</u>

It appears from the investigation of this case that the defendants are both nationals of Haiti and have no apparent ties to this community or even to the United States.  <u>See</u> <u>United States v. Townsend</u>, 897 F.2d 989, 996 (9th Cir. 1990) (holding that defendant's failure to have any ties to the United States is a relevant factor).  These defendants each present extraordinary risks of flight.  If given the chance to flee, given the seriousness of the charges and the weight of the evidence, these defendants could easily seek to exit the United States.  Should any of these

defendants flee back to Haiti, it would be exceedingly difficult if not impossible to bring them

back before the Court.


Respectfully submitted,

KENNETH L. WAINSTEIN
UNITED STATES ATTORNEY

By:_____
JEANNE M. HAUCH
Assistant United States Attorney
National Security Section
D.C. Bar #426585
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 514-5776


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served by US Mail and electronically on counsel for the defendant, Carlos Vanegas, Esq., Federal Public Defender for the District of Columbia, 625 Indiana Avenue, N.W., Suite 550, Washington, D.C. 20004, Fax: 202-208-7515, and Elita C. Amato, Esq., 1790 Lanier Place, N.W., Washington, D.C. 20006 on this 26th day of October, 2005.


_____
JEANNE M. HAUCH
Assistant United States Attorney